UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

UNITED STATES EX REL. STEPHEN R. MAHLER,
*on behalf of*
JOAN BONGARZONE-SUARRCY,

           Petitioner,

   -against-

ADA PEREZ,
*Superintendent, Bedford Hills Correctional Facility,*

           Respondent.

------------------------------------------------------------------ X

06 CV 5109 (ARR)

NOT FOR ELECTRONIC
OR PRINT
PUBLICATION

OPINION
AND ORDER

ROSS, United States District Judge:

Joan Bongarzone-Suarrcy, represented by counsel, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on September 22, 2006. Following a jury trial in New York State Supreme Court, Kings County, petitioner was convicted of second degree murder, N.Y. Penal Law § 125.25[1], and sentenced on September 5, 2002, to a term of imprisonment of 25 years to life. Petitioner argues that the admission at trial of the inculpatory statements she made to authorities on June 5, 2001, was unconstitutional because she had not been advised of her rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). For the reasons set forth below, the court denies the petition.

## BACKGROUND

On July 11, 1990, petitioner's husband, Anthony Suarrcy, was shot and killed as he sat in his car in front of their house in Brooklyn. In 2001, petitioner was indicted for the murder.

***Huntley* Hearing**

1

In May 2002, the trial court conducted a Huntley hearing to decide petitioner's pre-trial motion to suppress statements she made to law enforcement officers in 1998 and 2001.

A. Investigation in 1998

At the hearing, the court heard testimony that petitioner had been questioned about her husband's murder in August 1998 as a result of an investigation stemming from a suicide note left by Peter Cardone. In his suicide note, Cardone stated that he had had an affair with petitioner, who was extorting him. Cardone further stated that he feared for his life because he knew petitioner had had her husband murdered years ago and that she had told him this. Petitioner's home was searched and she was questioned by state police at the Highland Barracks ("barracks") and later by detectives from Brooklyn. She passed a polygraph examination and charges were not brought at that time.

B. Investigation in 2001

On June 5, 2001, petitioner went to the barracks and confessed to paying her brother to kill her husband in 1990. At the barracks, petitioner spoke with several state police officials and two detectives from Brooklyn. She was then driven to Brooklyn, where, approximately twelve hours after she entered the barracks, she wrote out and signed an additional statement. The statements petitioner made to law enforcement officials on June 5, 2001, are the subject of the instant petition.

1) Statements to Trooper Seals

State trooper Leroy Seals testified that on June 5, 2001, at 11:45 a.m., petitioner walked into the Highland Barracks and told him that she had a daughter, whom she wanted the police to pick up from middle school. Seals asked her why, and she said she didn't think she would be at

2

home. Petitioner then "started acting a little unusual, acting a little strange," became evasive, and started fussing repeatedly with the velcro on her sneakers. Petitioner stopped answering Seals' questions and stopped talking.

Petitioner asked to smoke a cigarette and, since smoking is prohibited in the barracks, Seals and petitioner went outside to smoke, where they engaged in small talk. Seals asked her why she would need arrangements to pick up her daughter. Petitioner explained that she probably would not be at home when her daughter returned from school. Seals asked petitioner if she was going to hurt herself. Petitioner said no and "eventually said that she did something bad a few years ago, and she wouldn't be going home as a result of it." Seals testified that he "once again prodded her as to what it was. And she said that ten years ago she paid someone to kill her husband." At first she had said she killed her husband; after further questioning, she said she hired someone else to kill him.

Seals asked her why and if the husband had been abusing her. She said he hit her once. And she again said that she paid someone to kill him ten years ago in Brooklyn. Seals asked her who it was and if they were still around, and she said she paid her brother $20,000 to kill her husband.

Seals then asked her if she would like to come into the barracks and talk about it, and she agreed, so he brought her into an interview room. Seals said, "She was absolutely cooperative after that point. It was like the dam had burst, and now everything was okay." Seals observed petitioner's behavior become more normal: "she spoke freely, stopped fidgeting, made eye contact." Seals got her a soda. Petitioner told him her name, date of birth, and address. Once inside, petitioner gave Seals a note she had previously written with contact information for her

daughter, her sister, and another individual.

At some point, Seals asked her why she was confessing, and she said she was having a hard time sleeping, having nightmares, and not eating properly. She never asked to stop speaking to Seals nor for an attorney. Seals, who at this time had no knowledge of any such murder in Brooklyn, asked petitioner to empty her pocketbook. After searching the contents and finding no weapon, he put everything back, left petitioner, and went to tell investigators what she had told him. Seals returned to the interview room and introduced investigator Bernard Keller.

2) Statements to Investigator Keller

Bernard Keller, an investigator with the state police, testified that at 12:15 p.m. on June 5, 2001, Seals informed him that petitioner had told him that ten years ago she had had her husband killed. Keller went into the interview room and asked petitioner to repeat what she had told Seals. She told him that ten years ago she had paid her brother $20,000 to kill her husband.

As petitioner spoke, Keller recalled that a couple of years ago two detectives from New York City had brought petitioner into the barracks to interview her in connection with the same case, although Keller himself was not involved with that investigation. At this point, Keller read petitioner the Miranda warnings from a card and asked her after each warning if she understood. She said yes to each warning and said that she was willing to talk.

Keller asked follow-up questions to learn more about what happened. Keller's interview of petitioner lasted from 60 to 90 minutes, during which told Keller that she had asked her brother, Frank, to kill her husband in exchange for $20,000, which she would pay him out of the insurance proceeds. Keller typed out a statement and then, with Seals also present, read it out loud to her, starting with the Miranda warnings printed at the top. Petitioner again said yes to

4

each of warnings and never asked for an attorney. Petitioner corrected some typos in the statement and signed it twice. Petitioner also spoke of her concern for her daughter's well-being. Keller asked her if she had been questioned in the barracks a couple of years ago, and she said she had, although she had not been ready to tell the truth then. Detectives arrived from Brooklyn and Keller informed them of the substance of petitioner's statement.

### 3) Statements to Detectives Dunne and Carrion

Maureen Dunne, a detective in Brooklyn, testified that on June 5, 2001, she, Detective James Carrion and others, went from the City to the barracks to investigate the Suarrcy murder. Dunne and Carrion were informed generally that petitioner had confessed to the 1990 murder and been Mirandized. At about 5:15 p.m., they began to interview petitioner in the interview room. Dunne told petitioner they knew she had previously received <u>Miranda</u> warnings and asked if she understood them, to which petitioner said, Yes. Petitioner then spoke with the detectives about her relationship with her husband and the details of the murder and insurance policy. The interview lasted 90 to 120 minutes, after which the detectives drove to Brooklyn with petitioner in the back seat of the car.

Detective Carrion testified similarly to Dunne about the interview in the barracks. Carrion further testified that in Brooklyn at 11:55 p.m. he asked petitioner to write down what she had stated at the barracks earlier that day. Carrion again reminded her that the state troopers had previously advised her of her rights and she indicated that she understood and proceeded to write out a statement. This lasted approximately five minutes, and he and petitioner signed the statement.

### 4) Other Statements

At the hearing, state trooper Robin Reed also testified that she had been summoned as the sole female trooper in the area to come to the barracks to sit with petitioner. From about 1:40 p.m. until 4:30 or 5 p.m., Reed sat with petitioner in the interview room whenever an investigator was not in the room with her. Reed asked petitioner her daughter's age. Petitioner replied, "Thirteen. I don't know how I am going to tell her. She's going to have a breakdown." Reed left once the detectives arrived from Brooklyn.

Edward Martinez, senior investigator in the barracks, testified that, after his investigators informed him about petitioner's admissions, he entered the interview room between 1:45 and 2:30 p.m. and told her that his son, Rich, was friendly with her daughter. Petitioner told Martinez, "Last night when you came by to pick up Rich I was going to tell you what I had done." Martinez told her that detectives would be arriving from the city and she should speak with her daughter.

At the Huntley hearing, each side called an expert psychologist to testify about petitioner's mental state on June 5, 2001, and the validity of her waiver of her rights.

### *Trial Court's Decision*

After setting forth his finding of facts (Hr'g Tr. 391-444) and hearing legal arguments, the trial court decided that the statements were voluntarily made and in accordance with the dictates of Miranda because "by the time that a person innocent of any crime would realize that they are in custody [s]he had been given her Miranda warnings." (Hr'g Tr. 495-97.) The court further held that petitioner's right to counsel had not attached in 1998, when an attorney claiming to represent petitioner–the same attorney representing petitioner in this case–called the barracks while she was undergoing a polygraph examination. (Hr'g Tr. 497-99.) In addition, the court

suppressed petitioner's statements to Senior Investigator Martinez from the prosecution's case-in-chief on the grounds that the prosecution failed to provide notice in accordance with state law. (Hr'g Tr. 490, 497.)

*Trial*

At trial, Seals, Keller, Dunne, Carrion, and Reed each testified in substantial conformity with their testimony at the <u>Huntley</u> hearing. The prosecution presented additional evidence about the murder and Suarrcy's life insurance. The court charged the jury on the voluntariness of petitioner's statements. (Tr. 583-88.) The court also charged the jury on acting in concert (Tr. 581-83, 596), and the jury convicted petitioner of second degree murder.

*Direct Appeal*

On December 6, 2004, the Appellate Division, Second Department, affirmed petitioner's conviction and sentence. <u>People v. Bongarzone-Suarrcy</u>, 13 A.D.3d 385 (N.Y. App. Div. 2d Dep't 2004). With respect to the initial confession to Seals, the court held that because petitioner "went to the barracks on her own volition, made the statement at her own insistence, and was not in custody or under arrest at any time before she made this inculpatory statement, <u>Miranda</u> rights were not required to be given at this time." <u>Id.</u> at 386. The court further held that even after petitioner's initial confession, she was not in custody.

> Although, in most instances, once an individual implicates himself or herself in a crime, he or she could reasonably be considered in custody, the circumstances of this case warrant a different conclusion. Any questioning by the State Trooper which followed the defendant's initial confession was not coercive, but rather investigatory. The State Trooper did not know if the defendant's statement was trustworthy, he had not been investigating the subject murder, and did not know whether the murder had even occurred. Further, during the brief questioning that followed, the

7

> defendant was not handcuffed, and did not request either to have an attorney or to leave the barracks. Since the defendant was not in custody, her statements to the State Trooper did not have to be suppressed. Nor was the defendant in custody during her brief questioning by an investigator. Since the statements made by the defendant prior to being given Miranda warnings were not the product of custodial interrogation, her subsequent statements, made after she received her Miranda warnings, were not tainted by the earlier statements.

Id. at 386-87 (citations omitted).

On February 9, 2006, the New York Court of Appeals affirmed petitioner's conviction. People v. Bongarzone-Suarrcy, 6 N.Y.3d 787 (2006). The court held, "Because there is support in the record for the suppression court's undisturbed finding that defendant was not in custody prior to the administration of Miranda warnings–a mixed question of law and fact–that issue is beyond our further review." Id. at 789-90. (The court also rejected petitioner's argument that the admission of incriminating statements she made in 2001 violated her right to counsel, holding that "any right to counsel that might have attached in 1998 did not prevent defendant from waiving counsel and speaking to police in 2001." Id. at 789.)

## DISCUSSION

In this case, petitioner argues that she is entitled to habeas relief because the state courts' determination that she was not "in custody" before she received Miranda warnings was based upon an unreasonable determination of the facts and an unreasonable application of clearly established federal law.

### I. AEDPA Standard of Review

The determination that petitioner was not in custody prior to the administration of Miranda warnings constitutes an adjudication on the merits that is entitled to deference under the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, habeas relief is warranted only if this determination (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's factual determinations regarding the circumstances surrounding an interrogation are entitled to a "presumption of correctness," and the petitioner carries the burden of overcoming that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Id. "Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing." Shabazz v. Artuz, 336 F.3d 154, 163 (2d Cir. 2003) (citing Patton v. Yount, 467 U.S. 1025, 1038 (1984)). However, the determination of whether those circumstances constitute custody "is a mixed question of fact and law." Parstad, 337 F.3d at 181-82 (citing Thompson v. Keohane, 516 U.S. 99, 112-13 (1995)).

## II. The "In Custody" Requirement

"There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda v. Arizona, 384 U.S. 436, 478 (1966). However, a person questioned by law enforcement officers after being taken into custody must receive "Miranda warnings." See Dickerson v. United States, 530 U.S. 428 (2000).

The "ultimate inquiry" for determining whether the circumstances surrounding an interrogation qualify as custodial is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 436 U.S. 1121, 1125 (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004) (holding that seizure is necessary but insufficient because "not every seizure constitutes custody for purposes of Miranda"). "The test for custody is an objective one . . . . [The test is] whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Newton, 369 F.3d at 671-72.

### III. The Factual Findings Were Not Unreasonable

Petitioner's contention that the factual findings regarding the circumstances of her questioning on June 5, 2001, were unreasonable is without merit. Petitioner has not offered any evidence, let alone the clear and convincing evidence required by AEDPA, to rebut the presumption of correctness to which these findings are entitled.

Petitioner argues that it is "logical to assume" that Seals "patted her down, if not actually searched her," (Pet. Mem. 21), whereas the facts found at the Huntley hearing indicate that Seals searched only petitioner's pocketbook (Hr'g Tr. 18, 393-94). Such "logic" does not constitute clear and convincing evidence.

Petitioner also questions whether Keller actually administered the Miranda warnings and whether petitioner waived them because "there is not any written acknowledgment from petitioner that she even received Miranda warnings." (Pet. Reply 4.) Petitioner disputes the factual findings, arguing, "Her responses to each of the warnings were not recorded and when

10

asked on direct what petitioner's responses to them were [Keller] could only state that she 'indicated yes,' which was still not made clear on cross-examination." (Pet. Mem. 29-30.) This argument distorts the record and is without merit.

On direct examination, Keller testified that he orally advised petitioner of her Miranda warnings, reading from a printed card, and that petitioner "indicated yes" each time he asked her if she understood each of the warnings. (Hr'g Tr. 51-53.) On cross-examination, contrary to petitioner's argument, this was clarified when Keller testified that by "indicated yes" he meant she specifically said "yes" to each question. (Hr'g Tr. 66.) The court's finding of facts reflect that she said yes to each warning. (Hr'g Tr. 399.) Petitioner did not contest this at the hearing nor does she offer any evidence to contest it now. The absence of a written waiver is immaterial. See, e.g., North Carolina v. Butler, 441 U.S. 369, 373 (1979) (rejecting proposition that Miranda waiver must be in writing).

Moreover, in this case, there is additional evidence that petitioner was advised of her Miranda rights and waived them. The typed statement Keller prepared listed the warnings at the top and Keller read these to petitioner before proceeding to read her confession back to her, after which petitioner signed the statement twice. (Hr'g Tr. 77-78, 400, 405.) In addition, the Brooklyn detectives later told petitioner that they knew she had already received Miranda warnings and asked her if she understood them. She did not contradict them, but rather she said she understood. (Hr'g Tr. 419, 422-423.)

After reviewing the testimony at the Huntley hearing, the court concludes that the state courts' findings of fact regarding the circumstances of petitioner's questioning on June 5, 2001, are not unreasonable. Petitioner has failed to overcome the "presumption of correctness" to

which they are entitled.

## IV. The Determination that Petitioner was Not "In Custody" was Not an Unreasonable Application of Clearly Established Federal Law

Petitioner's argument that the state courts unreasonably applied clearly established federal law in determining that she was not "in custody" prior to the administration of Miranda warnings is also without merit. Under the circumstances of her initial questioning by Seals and Keller on June 5, 2001, a reasonable person would not have understood her freedom of action to have been curtailed to a degree associated with formal arrest.

The record reflects that petitioner freely entered the barracks and conversed with Seals and then, while smoking with Seals outside the barracks, confessed to a decade-old murder that neither Seals nor any other officer was then investigating. As the Supreme Court noted in Miranda, "There is *no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime*, or a person who calls the police to offer a confession or any other statement he desires to make." 384 U.S. 436, 478 (1966) (emphasis added).

Petitioner argues that "in her mind she was in custody from the moment that she met Trooper Seals," because she indicated to Seals at the very outset that she would not be free to pick up her daughter that afternoon and Seals had to realize she "was about to incriminate herself about something that would cause her arrest." (Pet. Mem. 25-26.) This argument misconstrues the objective nature of the test for custody that triggers Miranda. "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The inquiry depends not on what petitioner or Seals

thought or should have thought, but rather on what a reasonable person would have felt under the circumstances of the interrogation. The circumstances of petitioner's arrival at the barracks, her conversation with Seals inside and outside while smoking plainly indicate that petitioner was not "in custody" when she first confessed to the murder.

Nor was petitioner "in custody" once Seals escorted her back into the barracks and, after searching her pocketbook, brought her into the interview room for further questioning. "A person who voluntarily accompanies the police to the station for questioning, without more, is not in custody." Harris v. Woods, No. 05 Civ. 5582, 2006 WL 1140888, at *25 (S.D.N.Y. May 1, 2006) (citing California v. Beheler, 463 U.S. 1121, 1122-25 (1983)). Nor does the interview room setting convert the noncustodial situation to one in which Miranda applies. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."); Cruz v. Miller, 255 F.3d 77, 81-82 (2d Cir. 2001).

Although one factor courts have evaluated in determining custody is "whether the suspect is searched, frisked, or patted down," the mere searching of petitioner's pocketbook does not establish custody and the additional factors to be considered–"whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; . . . and the length of the interrogation," Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998) (citations omitted)–suggest that petitioner was not "in custody" even once in the interview room. Petitioner was not handcuffed and never asked to leave or for an attorney. The questioning was brief, designed initially to elicit details to determine whether there had even

been such a murder or whether petitioner was a danger to herself or others. Even if a reasonable person would not have thought herself free to leave from the interview room, at this stage a reasonable person would not have felt that her freedom had been restrained to a degree associated with formal arrest. Thus, she was not "in custody." See Newton, 369 F.3d at 672.

Nor, for the same reasons, was petitioner "in custody" after Seals brought Keller into the interview room but before Keller administered the Miranda warnings. During this time, petitioner simply repeated to Keller what she had told Seals outside, which reminded Keller of the 1998 investigation and prompted him to administer the warnings.

Finally, it was not erroneous for the Brooklyn detectives to rely on Keller's warnings, ask petitioner if she understood them, and then question her without a fresh warning. See United States v. Banner, 356 F.3d 478, 480 (2d Cir. 2004) (per curiam) ("So long as the person in custody receives this warning from someone in authority, what uniform that person is wearing does not ordinarily affect the person in custody's understanding of his or her rights . . . . We see no reason to think that the fact that the resumption of questioning is by agents of a different sovereign means that a new Miranda warning is required.").

## **CONCLUSION**

For the foregoing reasons, the court denies the instant petition for a writ of habeas corpus. No certificate of appealability is granted with respect to any of the petitioner's claims, since the petitioner failed to make a substantial showing of any denial of her constitutional rights. The petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.

SO ORDERED.

                                                s/ Judge Allyne R. Ross

                                                Allyne R. Ross
                                                United States District Judge

Dated:        June 19, 2007
               Brooklyn, New York

SERVICE LIST:

<u>Attorney for Petitioner</u>
Stephen Mahler
Mahler & Harris PC
125-10 Queens Blvd.
Kew Gardens, NY 11415


<u>Attorney for Respondent</u>
Anne Covingman Feigus
Office of the District Attorney
Kings County
Renaissance Plaza
350 Jay Street
Brooklyn, NY 11201-2908